218

THOMAS A. SCULLY AND FREDERICK SCULLY, SOLE SURVIVING EXECUTORS OF THE ESTATE OF ENRIQUETA ANGELA SCULLY, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 80244.   Promulgated March 26, 1936.

*Robert F. Cogswell, Esq., D. H. Blair, Esq.,* and *J. G. Korner, Jr., Esq.,* for the petitioners.
*Chester A. Gwinn, Esq.,* for the respondent.

OPINION.

VAN FOSSAN: The respondent determined a deficiency of $3,067,-322.78 in estate tax. The sole question now presented for determination is whether decedent made two certain transfers of property in contemplation of death. The first transfer was made in 1918 and the second in 1927.

The parties stipulated certain facts, substantially as follows:

Enriqueta Angela Scully, the decedent, died on the sixth day of February 1932. She was born in the year 1850 and was 82 years of age at her death.

The decedent was the wife of the late William Scully, who died on October 17, 1906, at the age of 85 years.

Decedent was a citizen of the United States and a resident of the city of Washington, D. C., although at the time of her death and for some years prior thereto she was temporarily domiciled in England, where she died.

The residence of William Scully and the decedent and their family was 1401 Sixteenth Street, N. W., Washington, D. C.

The decedent, Enriqueta Angela Scully, was married to her husband, William Scully, in or about the year 1875. Decedent and her husband had four children, namely, Thomas A. Scully, who was born September 16, 1878, Angela Ida Harriet (Parry), born November 4, 1879, Frederick Scully, born October 2, 1881, and William, who died an infant without issue.

Prior to the years 1887 and 1900 William Scully had acquired extensive holdings of real estate, consisting of farm lands and other property. The lands were situated principally in the States of Illinois, Missouri, Kansas, and Nebraska.

In 1887 William Scully conveyed to his wife by fee simple deed all his lands in the State of Illinois. In 1888 he similarly conveyed to his wife his lands in the States of Kansas and Nebraska. In 1902 he similarly conveyed to his wife the lands in Missouri. At the time of the conveyance in 1887 William Scully was 66 years of age and his children were 9, 8, and 6 years of age, respectively. When the conveyances were made as aforesaid in 1902 William Scully was 81 years of age and his children were 24, 23, and 21 years of age, respectively.

William Scully had grave apprehension as to the bad effect upon his children of entrusting them with a large amount of property before they had reached an age of maturity and experience sufficient to enable them to conserve and manage it wisely, and he was anxious that large amounts of property should not be given to his children until they had evidenced their capacity to take care of it and not have their lives spoiled by it. On many and frequent occasions, over a long period of years, both before and after the conveyances referred to in the above paragraph William Scully discussed this matter with his wife and advised her that the properties conveyed by him to her should be by her divided and distributed to their three children, and as to the manner in which such division and distribution should be made. These discussions continued down to the time of William Scully's death.

William Scully advised his wife orally and in writing to make distribution of the property which he had conveyed to her, as well as other property which he might leave upon his death, among their three children when and if, in the judgment of the decedent, the children had attained sufficient age, experience, and capacity to take care of the property; and on November 8, 1900, William Scully wrote in his own handwriting a memorandum entitled "Suggestions to my Wife", which memorandum he endorsed "Approved on April 13, 1901", and in the said memoranda William Scully set forth his views as to the disposition of his lands and properties and either delivered the memoranda to his wife or made known to her the contents thereof before his death.

In order to increase the interest and sense of responsibility in his sons, Thomas and Frederick, William Scully employed the sons in his office and paid them a salary to assist him in looking after his property and his sons so remained in his employment to the time of their father's death. At the time of their father's death Thomas Scully was 27 years of age and Frederick Scully 25 years of age.

After the death of William Scully the two sons, Thomas Scully and Frederick Scully, continued to work in the employ of their mother in assisting in the management of the said lands and properties.

On December 4, 1918, the decedent executed deeds of conveyance to her two sons conveying the farm lands in the States of Illinois, Missouri, Kansas, and Nebraska, the said conveyance deeds being about fourteen in number. The conveyances were made to the two sons in severalty and represented the most feasible and just division of the lands between the sons. The division between the sons of these lands varied slightly from the original suggestions made by William Scully in his memorandum above referred to and the said variation was partly due to the fact that, at the time the distribution of the lands between the sons was made, some of the lands had enhanced in value while others had decreased in value, and for the further reason that it was necessary to make certain variations in order to get an equitable division of the lands in order that they might be more feasibly and economically managed. At the same time that decedent made the conveyances of lands to her sons she transferred to her daughter, Angela Ida Harriet Parry, securities in an amount to equalize her share of the division as compared with the lands conveyed to the two sons. The daughter was at that time married to a British subject and was living in London.

On December 12, 1927, the decedent made a further distribution of property among her three children in equal shares, the said distribution consisting entirely of securities. After making the distribution of securities among her three children on December 12, 1927, as aforesaid, the decedent retained securities in an amount in excess of $2,000,000, approximately 95 percent of the value of which was represented by United States Government bonds and Joint Stock Land Bank bonds. She likewise retained her residence at 1401 Sixteenth Street, N. W., Washington, D. C.

From and after the death of her husband, William Scully, the decedent kept separate accounts in the First National Bank of Chicago and the First Trust & Savings Bank of Chicago, in one of which accounts, designated by her as "estate accounts", she kept the income from the properties which she had received from her late husband in his lifetime, and in the other account, desig-

nated by her as "personal account", she kept the income from her own securities. The decedent kept the two accounts separately.

The following additional facts were adduced by testimony, either taken by deposition or given at the hearing:

In 1915 and again in 1918, at the ages of 67 and 70, respectively, decedent underwent serious surgical operations for gallstones. In the first operation her gall bladder, containing gallstones, was removed and gallstones were removed from the common bile duct. At Mrs. Scully's death on February 6, 1932, the death certificate was prepared by Dr. Henry Huxley, who had been her attending physician for many years, including the time when she underwent the two operations referred to. He stated the causes of death to be as follows:

(a) Cardiac debility,
(b) Chronic cirrhosis of the liver,
(c) Gallstones, gall bladder removed.

The health of the decedent, from the date of the second operation in 1918 to her last illness in 1932, was good, but she had occasional reminders of the liver (or gallstone) trouble which necessitated the operations in 1915 and 1918. She always suffered severely from seasickness and in the later years refrained from taking any kind of a boat trip for fear of serious consequences.

At various occasions after the death of the father the sons importuned the mother to make a division of the property. These suggestions were not received kindly by the decedent, who was a woman of strong will, with pronounced ideas of family discipline. She had a profound respect for the wishes of her deceased husband and considered his suggestions to be equivalent to commands to be carried out when the appropriate time arrived. By his memorandum of suggestions the husband left the determination of such time entirely to decedent's judgment. Decedent frequently indicated to the children and others that she intended to carry out the suggestions of the father by making distributions of the property. However, she shared her late husband's fear that the property would be squandered if the distribution occurred before the children proved themselves possessed of judgment and ability to manage the same efficiently. She referred to her desire to develop business capacity and responsibility in the sons, to see them enjoy the property, to be relieved of the care of management.

Decedent was a vigorous woman of unusual activity and keenness of interest in charitable affairs. She was never morbid and always made light of occasional indispositions. She entertained extensively and maintained close personal supervision over the large estates which she leased. In 1928 she took a three-year lease on one estate

and remodeled it at considerable personal expense. In 1930 she negotiated for a renewal of a lease for seven years on her London house.

In 1912 decedent made a will respecting her British property and in 1923 made a codicil thereto. She also had a will, executed at some early date, not fixed, dealing with the American property, which was superseded and destroyed on the execution of her last will on June 4, 1931.

Respondent held that the transfers of property in 1918 and 1927 were made in contemplation of death and determined the tax accordingly.

Section 302 (c) of the Revenue Act of 1926 reads, in part, as follows:

SEC. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

\*   \*   \*   \*   \*   \*   \*

(c) The extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, except in case of a bona fide sale for an adequate or full consideration in money or money's worth. \* \* \*

Article 16 of Regulations 80 provides, in part, as follows:

\* \* \* A transfer in contemplation of death is a disposition of property prompted by the thought of death. The phrase "contemplation of death" as used in the statute is not limited to contemplation of imminent death or to an apprehension that death is near at hand. Death must be "contemplated", that is, the motive which induces the transfer must be such that leads to testamentary disposition. A gift *inter vivos* which springs from a motive essentially associated with life rather than with death is not made in contemplation of death.

As the phrase "transfer in contemplation of death" is applicable to many varying transactions, the circumstances of each case must be examined to ascertain the motive which induced the decedent to make the transfer. If the transfer results from mixed motives, one of which is the thought of death, the more compelling motive controls. A condition of the mind or the body of the transferor (whether occasioned by old age or disease) which naturally prompts a testamentary disposition to a proper object of his bounty, will be considered a decisive test of contemplation of death in the absence of proof of the existence of purposes associated with life as the dominant motive for the transfer. \* \* \*

The above definition was obviously phrased to bring the regulations into conformity with the opinion of the Supreme Court in *United States* v. *Wells*, 283 U. S. 102. Each case depends on the facts there present. Though motive is a state of mind, it is, nevertheless, a fact to be determined from the evidence as are other facts.

We have tested the evidence in the instant case by the above stated concepts and find ourselves unable to agree with respondent's deter-

mination.   The record not only fails to establish that the gifts were testamentary in their essential character, but it clearly demonstrates the contrary.   The evidences, both oral and written, speak, not of death, but of life, of thoughts associated with and referable only to expected further life.   There was no coincidence in time between the making of the transfers and the making of decedent's wills.   Moreover, the record reveals clearly the impelling motive for the gifts.   They were made pursuant to a plan conceived years before by the father.   This plan was embodied in a holographic paper of suggestions to his wife, whose high respect for the judgment of her husband translated the suggestions into commands.   So interpreted, the suggestions of the father committed decedent to a distribution of the property when, in her judgment, the children had reached an age and possessed the ability properly to manage such extensive properties.   When this time arrived the transfers were made in contemplation, not of death, but of the satisfaction that would be derived from watching the donees administer their respective estates—the pride of the parent in the success of the children.

We hold that the transfers by decedent made in 1918 and 1927 here in question were not made in contemplation of death.   The respondent is reversed.

The above holding makes unnecessary the further hearing to fix values that would have been consequent on a contrary ruling.

Reviewed by the Board.

*Decision will be entered under Rule 50.*